# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DARRIS T. TAYLOR,

    *Petitioner*,

vs.

DWIGHT NEVEN, *et al.*,

    *Respondents*.

2:07-cv-00183-KJD-RJJ

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER

This matter having come on for an evidentiary hearing before the Court on June 15, 2010, with petitioner having appeared with his counsel, Terrence Jackson, Esq., and respondents having appeared through their counsel, Heather Proctor and Troy Jordan, Esq., and the Court having received testimony and evidence presented on petitioner's contentions seeking to overcome the procedural default bar as to Ground 1 and on the merits of Ground 1, as well as on the answer and reply as to both Grounds 1 and 2, does hereby make the following:

## FINDINGS OF FACT

1. Petitioner Darris Taylor challenges two different Nevada state court judgments of conviction. He challenges his March 30, 1998, conviction in No. C134371, pursuant to a jury verdict, of conspiracy to commit robbery, burglary while in possession of a firearm, and robbery with the use of a deadly weapon, in connection with the robbery of Alanna Franklin. (Hereafter, the "Franklin" conviction, trial, case or similar reference as the context requires.) He also challenges his July 19, 2000, conviction in No. C139801, pursuant to a jury verdict,

1  of robbery with the use of a deadly weapon and first degree murder with the use of a deadly

2  weapon, in connection with the robbery and murder of Melvin Charles Rayford.  (Hereafter,

3  the "Rayford" conviction, trial, case or similar reference as the context requires.)

4      2.  In Ground 1, petitioner alleges that he was denied his right to due process of law

5  in violation of the Fifth and Fourteenth Amendments at both the Franklin trial and the Rayford

6  trial because:  (a) the State allegedly solicited or failed to correct false testimony from

7  prosecution witness Akilah City regarding an alleged benefit promised and/or provided to City;

8  and (b) the State allegedly failed to reveal to defense counsel the existence of promises made

9  to City by the prosecution.

10     3.  In the exhausted portions of Ground 2 that remain before the Court, petitioner

11 challenges the sufficiency of the evidence supporting both convictions.  Petitioner alleges that

12 the evidence supporting the Franklin conviction was insufficient on the basis that Akilah City's

13 testimony was unreliable because she allegedly had a strong motive to lie.  Petitioner alleges

14 that the evidence supporting the Rayford conviction was insufficient because the State's

15 evidence allegedly was not sufficient to prove the requisite elements of the offenses.

16     4.  The evidence presented at the Franklin trial included evidence tending to establish

17 the following.[1]

18 In February 1996, Alanna Franklin and Reiko Moss shared an apartment near the

19 University of Nevada, Las Vegas (UNLV) campus.  Both attended UNLV, and Franklin had

20 a job at the Las Vegas Valley Water District.[2]

21 The young women planned a party at the apartment for February 3, 1996, to celebrate

22 Franklin's twenty-first birthday.  Franklin told the security guard at the water district to bring

23 some of his male friends as she knew mostly females.  He asked her whether it would be

---

[1] The Court summarizes trial evidence from the two trials both for general background to Ground 1 and in connection with the challenge to the sufficiency of the evidence in Ground 2.

The Court makes no credibility findings or other factual findings regarding the truth or falsity of the trial evidence over and above a finding that the evidence at trial included such evidence.  No statement of fact made in summarizing the evidence otherwise constitutes a finding of fact by this Court.

[2] #42, Ex. 11, at 41-43 (Reiko Moss); id., at 68-69 (Alanna Franklin).

1  alright to bring Derrell Price, who Franklin had met several times before.  The guard referred

2  to the fact that Price was interested in her.  Franklin responded that it would be alright to invite

3  Price but asked him to let Price know that he should not think that anything would happen

4  between them at the party.[3]

5         Derrell Price came to the party with a number of other males, including Darris Taylor.

6  During the party, there was a degree of conflict between Price and Franklin, as he wanted to

7  be alone with her and she wanted to enjoy her birthday party.  As Franklin described it, she

8  gave Price "the cold shoulder."  According to Deidre Hilton, a friend of Franklin's at the party,

9  Darris Taylor kept going into the back rooms in the apartment despite being told to stay in the

10  living room area with the rest of the guests.  According to Hilton, Taylor was argumentative

11  when they told him not to go into the back, and he also argued with Franklin.  In her

12  testimony, however, Franklin did not recall having words with Taylor in addition to Price.[4]

13         The next afternoon, Reiko Moss and a friend were leaving the apartment to go

14  somewhere else.  When Moss opened the door to leave, Darris Taylor was standing at the

15  door. He had not knocked prior to her opening the door to leave but instead was just standing

16  there, looking "a little lost."  Taylor asked whether they had seen his pager in their apartment

17  from the party the evening before.  Moss said that she had not seen it, and she went to the

18  back to ask Franklin, who was taking a nap.  Moss then asked Taylor for his name and phone

19  number in the event that they found the pager.  She wrote down "D," which Taylor also went

20  by, and a telephone number which later investigation confirmed was Taylor's number.[5]

21         About thirty minutes later, Franklin got up and was taking a shower, as she was

22  expecting a girlfriend to come by.  She heard a knock at the door and answered in her towel,

23  thinking that it was her friend.  A woman who she later positively identified from a photograph,

24  both at the preliminary hearing and a trial, as Akilah City instead was at the door.  Franklin

25  _____

26       [3]#42; Ex. 11, at 44 (Moss); *id.*, at 69-70 & 87-89 (Franklin).

27       [4]#42, Ex. 11, at 44-45 & 54-55 (Moss); *id.*, at 59-67 (Deidre Hilton); *id.*, at 70-74 & 87-90 (Franklin).

28       [5]#42, Ex. 11, at 46-49, 55-56 (Moss); *id.*, at 74 & 90-91 (Franklin); #43, Ex. 12, at 159 & 167.

had not met City prior to that time.  City said that she had been at the party the night before and that she had left her pager at the apartment.  Franklin let her into the apartment to look for the pager, initially believing that she was telling the truth.  As Franklin questioned City further about details, such as who she came with, City kept dodging the question.[6]

City started using Franklin's cell phone in a purported effort to try and locate the allegedly missing pager.  At this point, there was another knock at the door.  Franklin again answered in her towel, thinking once again that it was her friend.  Darris Taylor instead was at the door with Derrell Price in the background.  Taylor tried to in Franklin's words "barge in," and Franklin asked whether they were with City.  No one answered and they instead were quiet and just looked at one another.  Franklin pushed Taylor back outside saying that she was in her towel and that the other young woman was looking for her pager.  Taylor said words to the effect of "sure, sure . . . we'll wait outside."  Franklin closed and locked the door.[7]

Franklin and City then went to look one more time in the back bedroom and bath.  When they reached the back, City put a handgun to Franklin's waist and told her to get down.  Franklin said that "you guys" can take anything that you want.  City taped Franklin's hands, feet, mouth and over her eyes with duct tape, while continuing to threaten her with the gun.  As City was doing this she said that "those two guys that are out there, they're not with me . . . you know, I'm not associated with them."[8]

Franklin then felt City put the gun to her temple, and she kept it there for a moment.  Then all of a sudden Franklin saw flashes of light, and she thought that City had shot her in the head.  She felt blood flowing down from her head.[9]

As Franklin fell back, she heard City run out and the door close.  As Franklin wondered why City had just killed her and run out, she hear her return with two males.  Franklin

---

[6]#42, Ex. 11, at 74-77 & 91-92 (Franklin).

[7]*Id.*, at 77-78 & 92-93.

[8]*Id.*, at 78-80 & 93-94.

[9]*Id.*, at 80.

1  recognized Derrell Price's voice, but she did not recognize the other male voice.  She had not

2  ever seen Darris Taylor prior to her party the night before.[10]

3        Franklin lay there as if unconscious or dead, as she did not want the three to know that

4  she still was conscious.  City yelled at the two males that "you guys f—ed up" because they

5  had made a mistake and come to the door too early.  Franklin heard the two males come

6  back to where she was, and she heard them commenting "man . . . " as to what City had done

7  to her.  Franklin then heard the three ransacking the apartment and dumping things on the

8  floor as they discussed what they should take.  At one point, one of the males said that they

9  thought that City was supposed to put Franklin in the closet.  City rolled Franklin off the bed

10  and tried to put her in the closet, but she was a dead weight because she was pretending to

11  be unconscious.  Franklin let the towel fall off of her because she did not want to let the three

12  know that she was conscious.[11]

13        When the three had finished ransacking the apartment and were getting ready to leave,

14  one of the males told the other two to wait in the car because he had "something to handle

15  back there."  City said that they did not have time "for this" and that if the male stayed they

16  would leave him.  All three then left together.[12]

17        After several minutes of effort, Franklin worked her hands and an eye sufficiently free

18  to call 911.  The police arrived quickly, seemingly in less than a minute.[13]

19        When Officer Kevin Skehan and his partner arrived, they saw through the window of

20  the first floor apartment that the apartment was "apparently ransacked" and "in a great

21  disarray."  The front door was slightly ajar.  The officers entered the apartment with guns

22  drawn and conducted a sweep of the apartment to confirm that there were no threats present.

23  #42, Ex. 11, at 29-33 (Officer Skehan).

24

25      [10]#42, Ex. 11, at 71, 80-82 & 94-95 (Franklin).

26      [11]*Id.*, at 80-83.

27      [12]*Id.*, at 83-84.

28      [13]*Id.*, at 84-85.

1    As the officers entered the apartment, they heard a low, crying voice from the back.

2    As they swept the apartment for threats and reached the back bedroom, Officer Skehan saw

3    Franklin sitting on the bed naked holding a pillow in front of her and bleeding profusely about

4    the head.  She had duct tape on her hands and feet as well as across her eyes, and there

5    was a piece of duct tape that was around her neck as if it had slipped from her mouth.[14]

6    Officer Skehan immediately retrieved a Polaroid camera from his patrol car and

7    memorialized Franklin's appearance only moments after the attack and robbery.[15]

8    Medical personnel arrived as he did so, and Franklin was given immediate medical

9    attention.  As noted, she was bleeding profusely; and she was "very traumatized," "extremely

10   upset," "shaken, visibly shaken," and crying.  Franklin told the officers what had happened,

11   and she gave them the name of Derrell Price as one of the three involved in the robbery.[16]

12   The crime scene analyst observed, *inter alia*, that in the bedroom there was blood on

13   the bedding, a bloodstain on the carpet, and ransacked drawers; that in the living room there

14   were tapes scattered on the floor near the entertainment center and an empty area there as

15   if something were missing; and that there was "just general ransacking apparent."[17]

16   As Franklin was being wheeled out by the medical personnel to the ambulance, Reiko

17   Moss returned to the apartment after having been gone for about thirty minutes.  Franklin's

18   face and hair were "full of blood."[18]

19   Moss observed that the apartment "was tore up" and every room was "just trashed."

20   Missing items included jewelry, money, a CD player, the compact discs, a VCR, and a purse

21   that Moss had just set down in the kitchen a short time before when she was at the

22   apartment. #42, Ex. 11, at 50 (Moss); see also *id.*, at 86-87 (Franklin).

23   _____

24   [14]#42, Ex. 11, at 33-35 & 38 (Skehan).

25   [15]*Id.,* at 35-36 (Skehan).

26   [16]*Id.*, at 36-38 (Skehan); *id.*, at 85 (Franklin).

27   [17]*Id.*, at 106-09 (crime scene analyst).

28   [18]*Id.*, at 49-50 & 57-58 (Moss).

Moss later saw Darris Taylor's grandmother at the preliminary hearing with a purse that she identified from the condition of and a mark on the purse as the same purse.  The purse was confiscated and booked into evidence.[19]

When Franklin was examined by medical personnel, it was determined that she had not been shot but instead had been struck three times in the head, which required seventeen stitches.[20]

Over the course of the investigation, the police interviewed Derrell Price first, then Darris Taylor, and Akilah City last.[21]

Taylor's taped police interview was played for the jury at trial.[22]

In the interview, Taylor did not dispute that he was at the party with Derrell Price the evening before.  According to Taylor, Derrell Price thought that he was going to "hook up" with Alanna Franklin at the party but she rejected him.  Price stated that he was going to come back and "rob this bitch" to "show her whose the boss."  According to Taylor, Price knew a girl named Akilah who had a gun and contacted her.[23]

Taylor made conflicting statements in the interview regarding his knowledge of the gun. At one point, he states that he never saw a gun.  At another, he states that he saw Akilah City go to the door of the apartment with the gun and that that was "the last I seen of the girl and the gun."  At yet another point in the interview, Taylor once again states that he did not see a gun.  Taylor further maintained that the day of the incident was only the second time that

---

[19]#42, Ex. 11, at 51-54 & 56-58 (Moss); #43, Ex. 12, at 163-64 (detective).

[20]Id., at 87 & 94-95 (Franklin).

[21]#43, Ex. 12, at 158-60, 165 & 169-70 (detective).

[22]Id., at 159-63 (detective).  It does not appear that the parties have filed a copy of the transcript made of the interview into the record in this federal habeas matter.  The following paragraphs describing the content of the interview are drawn from unchallenged and uncontradicted descriptions of the content of the interview at various points in the state court record, including unchallenged -- and uncontradicted -- findings by the Supreme Court of Nevada regarding Taylor's statements during the interview.

[23]#42, Ex. 11, at 23 (State opening statement); #43, Ex. 12, at 208 (State rebuttal argument); #44, Ex. 39, at 1 & 4 (order of affirmance).

1   he had met Akilah City.  According to Taylor, City was more a friend of Derrell Price than a

2   friend of his.[24]

3       At one point in the interview, Taylor maintained that he went inside the apartment with

4   Price to look for his pager, after City already had entered the apartment.  He maintained that

5   City was breathing hard "like a basketball player or something."[25]

6       Elsewhere in the interview, Taylor maintained that he went into the apartment to help

7   Price's friend City move something of hers – "a big purse full of stuff" –  from the apartment.

8   He asserted that he never went into the back and stayed only in the living room.  He sought

9   to maintain that he did not realize that there possibly may have been a robbery going on until

10  afterwards when he was in Price's car.[26]

11      At Taylor's trial, the defense did not dispute that Taylor was at the party with Derrell

12  Price the evening before, that Taylor was with Price the next day, that Taylor was outside the

13  door of the apartment the next day when Reiko Moss opened the door to leave and found him

14  there, that he left his number with Moss, and that Taylor came back to the same apartment

15  a short time later with Price.  The defense maintained, however, as per some of Taylor's

16  statements to the police, that he went back to the apartment only to help Price's friend Akilah

17  City move something and that he was aware of nothing else occurring.[27]

18      Taylor apparently did not anticipate at the time of his statements to the police that the

19  victim would testify at trial, *inter alia*, that she had remained conscious, that she heard City's

20  statements to the two men consistent with the three having a prior plan, and that she heard

21  Price and the male with him walk back into the bedroom, observe her, and comment.  Taylor

22

23      [24]#43, Ex. 12, at 190-91 & 208-10 (State's closing and rebuttal arguments); #44, Ex. 39, at 3 & 6
24  (order of affirmance).

25      [25]#43, Ex. 12, at 191 & 208-09 (State's closing and rebuttal arguments).

26      [26]#42, Ex. 11, at 23-24 (State's opening statement); #43, Ex. 12, at 191 & 209-10 (State's closing and
    rebuttal arguments); #44, Ex. 39, at 3 & 6 (order of affirmance).
27
        [27]#42, Ex. 11, at 25-28 (defense opening statement); #43, Ex. 12, at 195, 196 & 197-98 (defense
28  closing argument).

1   apparently also did not anticipate that Franklin would testify that she heard the three
2   ransacking the apartment as opposed to merely moving something that was packed.

3       Akilah City's testimony at the Franklin trial included testimony as to, *inter alia*, the
4   following.

5       City was eighteen years old at the time of the robbery, and she had known Darris
6   Taylor, who was twenty-two years old at the time of the robbery, for about three years.  They
7   were intimate, and, although she did not know it at the time, she was pregnant with his child
8   at the time of the robbery.[28]

9       On the evening before the robbery, Darris Taylor called City and asked her to help with
10  a robbery of a young woman the next day.  The next afternoon, she met up with Darris Taylor
11  and Derrell Price and rode to Franklin's apartment in Price's car.  Taylor outlined a plan under
12  which City would knock on Franklin's door and say that she lost her pager, tie up Franklin with
13  duct tape, hit her in the head with a gun, put her in the closet, and then go get the two men
14  to finish the robbery.  Taylor provided City with the duct tape and the gun.  At Franklin's
15  apartment, everything went according to Taylor's plan except that the two men knocked on
16  Franklin's door while City still was pretending to be looking for a pager.[29]

17      City thereafter tied up Franklin with the tape and hit her in the head with the gun.
18  Taylor and Price then entered the apartment, and the three started to ransack the apartment.
19  Taylor at one point looked into the bedroom where Franklin was, and he asked City why she
20  had not put Franklin in the closet.  Taylor ultimately put Franklin in the closet.[30]

21      5.  When the police questioned Akilah City on March 7, 1996, nearly two years before
22  trial, she gave substantially the same account to the police as she did at Taylor's trial
23  regarding both Taylor's involvement in the Franklin robbery as well as her own actions.  At the
24  end of the interview, however, when the detective asked her whether she would like to add

25  _____

26      [28]#43, Ex. 12, at 133, 135-36 & 144; see also *id.*, at 172 (Taylor's age).

27      [29]#43, Ex. 12, at 139-42, 148-50 & 152-53.

28      [30]*Id.*, at 142-43.

1   anything, City said that she "didn't have nothing to do with it."  She made this statement
2   notwithstanding the fact that she had just described in detail her own extensive involvement
3   with Taylor in the Franklin robbery.  At trial, City did not deny that she made the statement
4   shown to her from the end of the interview transcript, but she neither recalled making the
5   statement nor knew why she would have said that.[31]

6   6.  Akilah City told the police what she told them in March 1996 about Darris Taylor's
7   involvement in the robbery without the police or the district attorney offering to provide,
8   agreeing to provide, or providing any *quid pro quo*, benefit, or promise of a benefit.

9   Petitioner has not presented any evidence that City made the statements to the police
10  in March 1996 in exchange for a *quid pro quo*.  Akilah City's defense counsel at the time,
11  Virginia Eichacker, was not aware of any *quid pro quo* provided by either the police or the
12  district attorney.  Akilah City testified that she did not recall anyone making any promises to
13  her other than an alleged promise by Abbi Silver in 1998 two days before the Franklin trial,
14  which alleged promise is discussed *infra*.  Petitioner thus presented no evidence at all that
15  City's statements in March 1996 were given as part of a *quid pro quo* deal or promise.[32]

16  7.  On April 9, 1996, nearly two years before the Franklin trial, Akilah City pled guilty
17  to robbery with the use of a deadly weapon for her part in the robbery.  At that time, as part
18  of the plea bargain, the State dismissed additional charges against her of conspiracy to
19  commit robbery and burglary while in possession of a firearm arising from the Franklin
20  robbery.  Neither the dismissal of the charges nor the plea bargain as a whole was contingent
21  upon any agreement by City to testify against Taylor or to otherwise cooperate with the State.
22  City was sentenced following her plea to two consecutive terms of 26 to 65 months.  She had
23  served two years on her sentence by the time of the Franklin trial, and she still was
24  incarcerated at the time that she testified.  #43, Ex. 12, at 136-39 & 148-49.

25  / / / /

26

27  [31]#43, Ex. 12, at 144-55.

28  [32]#88, Federal Evidentiary Hearing Transcript ("Transcript"), at 12 (Eichacker); *id.*, at 60 (City).

-10-

8.   Then-chief deputy district attorney Abbi Silver was the prosecutor at the Franklin trial.  City testified at trial that Silver, who was not involved with her case and plea, had not provided her any benefits or promised her any benefits for testifying.[33]

9.   On January 14, 1998, the day that Akilah City testified in the Franklin case, the remaining evidentiary presentation was completed, the court gave the jury instructions, and counsel made their closing arguments.  The court then dismissed the jury to return the following morning to begin deliberations.[34]

10.   Later that same day, after the evidence had been concluded and the closing arguments had been made, Silver wrote a letter to the Nevada Board of Parole and Pardons. The  letter read as follows:

> I am writing this letter to apprise the Parole Board regarding Akilah City's cooperation with State Prosecutors on a Co-Defendant's case, State of Nevada v. Darris Taylor.  I did not promise, let alone tell Akilah that I would even write a letter like this, but I wanted to send this on her behalf.
>
> Akilah pled guilty to the charge of Robbery With Use of a Deadly Weapon and was sentenced on this case almost two (2) years ago.  The Co-Defendant's (the person the State believes convinced Akilah to do this crime) trial was set for January 12, 1998.  On January 11, 1998, I met with Akilah who was pleasant, and very cooperative with myself and my investigator.  She related to us the same information she gave police and parole and probation two years prior.  Akilah could have refused to cooperate or testify.  Instead, she accepted her role, pled guilty, is serving her time, and cooperating with law enforcement two years later.   Additionally, Akilah testified against the Co-Defendant and father of her third child.
>
> It is my belief that Akilah is sincere about her remorse for the crime she committed. Further, she accepted responsibility by pleading guilty to Robbery With Use of a Deadly Weapon.  She continues to help law enforcement in the matter.   The Co-Defendant is a four-time convicted felon with a Robbery with Use of a Deadly Weapon case and Murder case pending.  Akilah's assistance is appreciated by the State.

#43, Ex. 13.

---

[33]#43, Ex. 12, at 137-39 & 145.

[34]#42, Ex. 1, at 13 (minutes).

1    11.  Silver made no promise to Akilah City that she was going to send such a letter or

2  provide her any other benefit as a result of her testimony in the Franklin case.  There was no

3  prior promise or agreement to provide any *quid pro quo* for her testimony, either with regard

4  to sending such a letter or otherwise.

5    In this regard, this Court finds Silver's testimony that she made no such promise or

6  agreement to be credible.  Silver had a good recall of the Franklin case.  She used the

7  Polaroid pictures taken of the victim by the first-responding officer as a training aid because

8  the pictures demonstrated how officers could preserve such very effective evidence that

9  would not be available thereafter.  While Silver no longer recalled each and every factual

10  particular of the case completely accurately as of the time of her federal hearing testimony,

11  her recollection was reliable as to a substantial matter such as whether she promised a

12  benefit or a *quid pro quo* to a prosecution witness.  After hearing her evidentiary hearing

13  testimony and viewing her demeanor, the Court finds that Silver credibly testified that she

14  made no promise or agreement to provide a *quid pro quo* for City's trial testimony.[35]

15    The Court does not find Akilah City's testimony at the federal evidentiary hearing that

16  Silver made such a prior promise or agreement to be credible.  When asked at the outset of

17  her hearing testimony what her relationship was with Taylor, she responded that "[h]e was like

18  my best friend."[36]  She additionally acknowledged that she wants Taylor to be a part of their

19  now-thirteen year-old son's life.[37]  Over and above City's still-continuing bond with Taylor, her

20  recollection of the Franklin and Rayford trials had dimmed substantially over the ensuing

21  years.  She did not remember even that she had testified twice in two different trials.[38]  After

22  hearing her evidentiary hearing testimony and viewing her demeanor, the Court finds that

23  City's testimony on this point, at best, reflected an incorrect reconstruction of events in her

24

25    [35]See Transcript, at 30-42 & 45-51.

26    [36]*Id.*, at 53.

27    [37]*Id.*, at 53 & 69.

28    [38]*Id.*, at 53 & 62-69.

1  mind in an at least subconscious effort to help her friend and the father of one of her children.

2  Her testimony did not credibly establish that Silver made a promise to her to write the letter

3  or provide any other benefit as a *quid pro quo* for her testimony.

4          12.  Silver instead prepared and sent the letter as a spontaneous act.  She had never

5  written a similar letter on behalf of a witness prior to the Franklin trial, and she never wrote a

6  similar letter thereafter.[39]

7          13.  Silver did not provide a copy of the letter to defense counsel representing Taylor

8  in the Franklin case.  Whether correctly or not, she did not believe that the letter, which was

9  not sent as a *quid pro quo*, was required to be copied to defense counsel.[40]

10         14.  When Taylor's appellate counsel Lori Teicher prepared the Franklin direct appeal

11  briefing in or around August 2002, she was not aware of the Silver letter.  The letter was not

12  part of the defense file in the Franklin case, and Teicher otherwise was not aware of it.  It is

13  more probable than not that Teicher would have raised an issue on appeal in this regard if the

14  Silver letter had been present in the Franklin file during the appellate briefing in that case.[41]

15         15.  The evidence presented at the Rayford trial in May 2000 included evidence

16  tending to establish the following.[42]

17         In early 1996, Melvin Charles "Ray" Rayford lived in Bloomington, California, in the Los

18  Angeles metropolitan area.  Rayford lived with his girlfriend, Keisha Braxton, and their

19  children.  In late February 1996, they accepted a number of collect calls for Rayford from a

20  male identifying himself as "Block," which is an alias for Darris Taylor.[43]

21  _____

22          [39]See Transcript, at 35-36, 40-41 & 47-48.

23          [40]See *id.*, at 41-42, 44-45 & 48.

24          [41]See *id.*, at 15-20.  Whether such an issue would have been successful on appeal is another matter,
25  as is discussed in Conclusion No. 5, *infra*.

26          [42]The Court, again, makes no credibility findings or other factual findings regarding the truth or falsity
   of trial evidence over and above a finding that the evidence at trial included such evidence.  See n. 1, *supra*.

27          [43]#43, Ex. 24, at 82-89 (Bates numbering 001066-67)(Braxton); #43, Ex. 23, at 167-68 (detective);
28                                                                                      (continued...)

-13-

1    On Thursday, February 29, 1996, Rayford drove to Las Vegas in his white Cadillac.

2   He told Braxton on the phone after he left that he went to Las Vegas to post a surety for

3   Block.  J.B. Starks testified that Rayford told him before he left that he was going to Las

4   Vegas to post a surety for Darris Taylor and was to receive cocaine in return.[44]

5    On February 29, 1996, Rayford checked into the then-City Center Motel, a two-story

6   motel in downtown Las Vegas at the corner of East Fremont Street and Seventh Street.[45]

7    It was stipulated at trial that Darris Taylor was not with Rayford on Friday, March 1,

8   1996, at any time prior to 11:30 a.m. on that date.  The parties stipulated that Taylor was

9   "incapacitated" up until 11:30 a.m. on Friday, March 1, 1996, apparently as a nonpejorative

10   reference in the jury trial to his being incarcerated.[46]   In an interview with police that is

11   discussed in greater detail *infra*, Taylor admitted that he was with Rayford after that point up

12   until, according to Taylor, approximately 12:45 a.m. on Saturday, March 2, 1996.[47]

13    Akilah City testified, *inter alia*, that Taylor called her from the motel during the afternoon

14   of Friday, March 1, 1996.  According to City, Taylor asked her to help him with the murder of

15   a male acquaintance of his from California who "had a lot of money" in order to steal some

16   drugs from him.  Taylor wanted City to sit in the back seat behind the victim and shoot him

17   from behind.  City refused because "I'm already in enough trouble."  Taylor stated in response

18   that he "would just do it."  Phone records showed that calls in fact had been placed from

19   Rayford's room to the telephone number where City lived.[48]

20

21   _____

22   [43](...continued)
     #43, Ex. 25, at 59-60 (Taylor's father).

23   [44]#43, Ex. 24, at 84, 89,  & 110 (Bates 001066-67 & 001073)(Braxton); *id*., at 139-44 & 151 (Bates
24   001081-81 & 001083)(Starks).

25   [45]See,e.g., #43, Ex. 21, at 34-36, 44 & 49-51 (housekeeper and front desk clerk).

26   [46]#43, Ex. 23, at 118-19; see also *id.,* at 130-33 (detective).

27   [47] See text, *infra*, at notes 62-68.

28   [48]#43, Ex. 23, at 11-21, 29-34, 38-40, 41-43 & 45-52 (City); *id.*, at 163-64 & 219-20 (detective).

-14-

1    Meanwhile, over the course of Friday, March 1, 1996, Rayford made a number of calls

2    on the cell phone that he brought with him back to Braxton and Starks in southern California.

3    Rayford told Braxton over the course of the day that he was with "Block."  Rayford indicated

4    to Braxton that he was waiting for Block "to give him what he paid for," *i.e.,* "what he came out

5    there for."  The last call that Braxton received from Rayford was at 9:05 p.m.  Rayford

6    indicated to Starks that he was having to wait until midnight to get the cocaine from Taylor

7    and that the amount had been increased.  The last call that Starks received from Rayford was

8    at 10:13 p.m.[49]

9    Darris Taylor lived in a bedroom at his grandmother's house.  At 2:19 a.m. on

10   Saturday, March 2, 1996, a call was placed from Rayford's room to that number that lasted

11   29 minutes, until 2:45 a.m.[50]

12   At approximately 3:30 to 3:45 a.m. on Saturday, March 2, 1996, Pat Berry, who lived

13   in an apartment at North Eleventh and Stewart Streets, was awakened by the sound of a car

14   pulling into the driveway right under her first-floor window.  The apartment was four blocks

15   east and two blocks north of the City Center Motel, or approximately a half mile away over the

16   streets.  Berry heard the motor run for a couple of minutes and then stop.  She heard car

17   doors opening and closing, like someone was being picked up; and she then heard a different

18   car drive away.[51]

19   There were no calls placed on the cell phone that Rayford brought with him from

20   California between 11:04 p.m. on Friday, March 1, 1996, and 5:24 a.m. on Saturday, March

21   2, 1996.  At 5:24 a.m. on March 2, 1996, a call was placed that went to a 909 area code

22   number.  The 909 area code was the local southern California area code for the cell phone

23   and encompassed the general San Bernardino area, including, *inter alia*, Bloomington,

24

25       [49]#43, Ex. 23, at 206-09 (detective); *id.*, at 90-94, 110-13, 121-25 (Bates 001068-69, 001073 &,

26   001075-76)(Braxton); *id.*, at 147-57 (Bates 001082-84)(Starks).

27       [50]#43, Ex. 23, at 75, 165-67 & 211 (detectives).

28       [51]#43, Ex. 22, at 151-62 & 166-67.

California.  Three minutes later, at 5:27 a.m., a call was placed to the same seven-digit number but instead using the Las Vegas area 702 area code.  The call was placed to the number of an individual that a detective testified was an acquaintance of Darris Taylor.[52]

At 5:34 a.m. on Saturday morning, March 2, 1996, Taylor called Keisha Braxton in southern California, waking her up.  Taylor placed the call on the cell phone that Rayford had brought with him from California.  Taylor identified himself as Block and asked Braxton whether Rayford was there.  She said that he was not there and asked: "Isn't he with you?"  Taylor responded that he had not seen him, and Braxton stated that she would tell Rayford that Taylor had called.[53]

Thereafter, calls were placed on the cell phone that Rayford had brought with him to a number of Darris Taylor's acquaintances and family members.  Calls were made to persons known to Taylor over the course of the next three days, up until 1:52 p.m. on March 5, 1996, after which time Taylor once again became "incapacitated."  Taylor also called the investigating detectives back on this same cell phone that Rayford had brought with him from California.[54]

In the meantime, at some point after 7:00 a.m. on Saturday morning March 2, 1996, the resident of the motel room next to Rayford's room complained to the front desk clerk that there had been a lot of noise in an adjacent room the prior night.  The desk clerk recalled the guest stating that the noise came from Rayford's room.  An investigating detective testified instead that the guest, who since had deceased, told him that the noise was coming from a party in the room adjacent to his on the other side from Rayford's room.  Either way, there either was loud noise coming from Rayford's room or noise coming from another nearby room that possibly may have masked loud noises coming from Rayford's room.  The guest in the

---

[52]#43, Ex. 23, at 200-05 & 211-15; *id.*, Ex. 24, at 65 & 74-75 (Bates 001061 & 001064) (detectives).

[53]#43, Ex. 23, at 213-14 (detective); *id.*, Ex. 24, at 74-75 (Bates 001064)(detective); *id.*, at 94-96, 113-17, 120-21 (Bates 001069, 001073-74, 001075)(Braxton).

[54]#43, Ex. 23, at 214-221 (detective); *id.*, Ex. 24, at 34-35, 65 & 74-77 (Bates 001054, 001061 & 001064)(same).

1   room next to Rayford's further was away from his room from approximately 1:30 to 4:30 a.m.

2   that morning.[55]

3       At approximately 10:00 a.m. that Saturday morning, a City Center Motel housekeeper

4   knocked and announced herself at the door of Rayford's room.  When she got no response,

5   she opened the door.  She saw a black male slumped over the edge of the bed in the

6   darkened room, however.  Thinking that he was sleeping, she closed the door again.  The

7   rooms had an additional lock that could be engaged by someone from the inside, but this

8   additional lock had not been engaged, which is why the housekeeper had been able to enter

9   from the outside with the pass key.[56]

10       A short time after checkout time at noon, motel employees again checked on the room.

11   They again observed a nonresponsive black male slumped over the edge of the bed in the

12   darkened room.  When the manager saw blood on the bedding and did not see any signs that

13   the man was breathing, he had the front desk call 911.[57]

14       When the police and paramedics arrived, they found Rayford dead on the bed.

15   Rayford had been killed by three .25 caliber gunshot wounds to the left side of his head and

16   face, with at least one of the gunshots having been fired from no more than two feet away.

17   Rayford's body was laying face down partially on the bed with blood and blood spatter on the

18   body and the adjacent bedding and wall.  Rayford was clothed in a t-shirt and boxers.  There

19   were no other clothes in the room other than a Super Bowl XXX ball cap and a pair of athletic

20   shoes.  The medical examiner estimated that the time of death occurred in an approximate

21   range of from thirty to forty hours prior to the autopsy, with thirty hours prior to the autopsy

22   corresponding to 3:00 a.m. on Saturday morning, March 2, 1996.[58]

23

24       [55]#43, Ex. 21, at 44, 56-57 & 66-67 (front desk clerk); *id.*, Ex. 24, at 15-19 (Bates 001049-50).

25       [56]#43, Ex. 21, at 35-42 (housekeeper).

26       [57]#43, Ex. 21, at 45-47 (front desk clerk); *id.*, Ex. 22, at 16-20 (housekeeper); *id.*, at 23-33 (manager).

27       [58]#43, Ex. 22, at 35-40 (first responding police officer); *id.*, at 45-62 (deputy medical examiner); *id.*, at

28       (continued...)

1      There were no signs of forced entry or ransacking of the room.  Three .25 caliber

2  expended shell casings or cartridge cases were recovered in the motel room, and three .25

3  caliber projectiles were recovered during the autopsy.  Fingerprints matching Darris Taylor's

4  fingerprints were recovered from the motel room door.[59]

5      Meanwhile, when Pat Berry arose earlier in the morning of March 2, 1996, she saw a

6  white Cadillac with a California license plate parked in the driveway under her apartment

7  window.  She checked with neighbors and the apartment manager, but the car was not

8  connected with anyone there.  They decided to have the car towed.  It was stipulated at trial

9  that the car was Rayford's white Cadillac and that it was towed from the alley at 12:10 p.m.

10  on Saturday, March 2, 1996.  The police learned that afternoon that Rayford's vehicle had

11  been towed from the location, and the police impounded and processed the vehicle.[60]

12      It was stipulated at trial, as to the time period after the murder, that Darris Taylor had

13  possession of a number of items that had been in Rayford's possession when he came to Las

14  Vegas from southern California,  including distinctive items such as a leather Super Bowl XXX

15  jacket, a long sleeve Negro League Baseball sweatshirt, a gold herringbone necklace, and

16  the cell phone that he was using.  It further was stipulated that, after Taylor again became

17  "incapacitated" on March 5, 1996, he had his father retrieve and move the items from his

18  grandmother's house.[61]

19      On Sunday, March 3, 1996, a detective conducted a voluntary interview of Darris

20  Taylor at his room at his grandmother's house.  Taylor stated that he had been with Rayford

21

---

22  [58](...continued)

23  72-74, 81-84 & 123 (crime scene analyst); #43, Ex. 23, at 58, 133-34 & 145 (detectives).

24  [59]#43, Ex. 22, at 72-73, 84, 90-91 & 103-09 (crime scene analyst); *id.*, at 134 (fingerprint examiner);
    #43, Ex. 23, at 59-63 & 146-47 (detectives).

25  [60]#43, Ex. 22, at 162-65 & 168-69 (Berry testimony and stipulation); #43, Ex. 23, at 65-66 & 152-57

26  (detectives).

27  [61]#43, Ex. 23, at 199-200; see also *id.*, Ex. 23, at 21-23, 74-82, 95-96, 134-35, 170-78 & 180-99); *id.*,
    Ex. 24, at 58-60, 72-73, 99-109, 122 & 126-28 (Bates 001060, 001063, 001070-72, 001076 & 001077); *id.*,

28  Ex. 25, at 54-59 (Bates 001137-38)(sundry corroborating testimony to the same effect).

on the day and evening of Friday, March 1, 1996, from approximately 11:00 a.m. until approximately midnight.  According to Taylor, Rayford was in Las Vegas to post a surety for Taylor and to take some drugs back to Los Angeles.  Taylor maintained that the drug transaction was a separate transaction in which he was not involved.[62]

Taylor varied as to details and the specifics of the time line for the period that he was with Rayford.  According to Taylor's account, they first ate at a restaurant.  They then "kicked it" for an unspecified time, apparently at the motel room.  They then went to the home of Taylor's friend Daryl White from approximately 8:00 to 10:00 p.m.  They then went to Taylor's room at his grandmother's house.  They then went back over to Rayford's motel room.  Rayford then dropped Taylor back over at his grandmother's house, at approximately 12:45 a.m. on Saturday, March 2, 1996, stopping in for a moment.[63]

Taylor admitted making about five telephone calls from Rayford's motel room.  This admission tended to further corroborate Akilah City's testimony that she received a call or calls from Taylor from the motel in the afternoon of March 1, 1996.[64]

It was stipulated at trial that Rayford placed a call to a friend of his in Las Vegas from the telephone at Taylor's grandmother's house at approximately midnight.[65]

Taylor maintained initially in the interview that Rayford told him when he dropped him back off at his grandmother's house after midnight that he would be returning to California early that morning.  Taylor maintained that that was the last time that he heard from Rayford. As the interview progressed, the detective pointed out that phone records showed a call from Rayford's motel room to Taylor's grandmother's house at 2:16 a.m. on Saturday, without the detective telling Taylor the length of the call.  Taylor acknowledged that he received the call from Rayford.  Taylor maintained that it was only a brief conversation in which Rayford said

[62]#43, Ex. 23, at 173-74; *id.*, Ex. 24, at 19-26 & 44-45 (Bates 001050-52 & 001056)(detective).

[63]#43, Ex. 24, at 23-34, 44-49 & 70 (Bates 001051-54, 001056-57 & 001063).

[64]*Id.*, at 51 (Bates 001058).

[65]*Id.*, at 51-53 (Bates 001058).

-19-

1    that the drug deal was not going to go through and that he would be leaving for California

2    early in the morning.  The actual phone record, however, showed that the call lasted 29

3    minutes, until 2:45 a.m.  According to Taylor, it was this call that was the last time that he

4    spoke with Rayford.[66]

5        Taylor acknowledged that he had called Keisha Braxton on Saturday morning, March

6    2, 1996, "to see if Rayford had gotten home."  This admission lined up both with Braxton's

7    testimony and with the phone records showing a call on the cell phone to Braxton at 5:34 a.m.

8    that morning.[67]

9        At the end of the interview, the detective asked Taylor whether he knew of anything

10   else that would help in the investigation.  Taylor did not tell the police that he had the victim's

11   clothing and the cell phone that the victim had been using.  The detective saw the phone and

12   other items at the time of the interview, but he did not have sufficient information at that early

13   juncture to know that the items were connected to the victim.[68]

14       That same afternoon, on Sunday, March 3, 1996, Taylor again called Keisha Braxton,

15   once again using the cell phone that Rayford had brought with him from California.  Taylor

16   said that the police had been there questioning him and "they think that he did it, but he didn't

17   have anything to do with that."  Taylor said that he had not seen Rayford, but he then stated

18   that Rayford had dropped him off and that he had not seen him since that point.  Taylor said

19   that he had called to see if Rayford had made it home.  Braxton testified that Taylor "was

20   babbling on and on."[69]

21       At some point after March 2, 1996, Don Price, an acquaintance of Taylor's had a

22   conversation with Taylor about the incident.  Taylor initially told Price that he and Rayford

23   were at a downtown motel and some fools "from the city," which Price understood to mean

24

25       [66]#43, Ex. 23, at 165-67 & 211; *id.*, Ex. 24, at 28-31, 34 & 71 (Bates 001052-54 & 001063).

26       [67]#43, Ex. 24, at 35-36 & 73-75 (Bates 001054 & 001063-64).

27       [68]#43, Ex. 23, at 170-73; *id.*, Ex. 24, at 37-38 (Bates 1054-55).

28       [69]#43, Ex. 24, at 36 (Bates 001054)(detective); *id.*, at 97-98 (Bates 001069-70)(Braxton).

1    California, came in and shot Rayford.  According to the initial story, however, they gave Taylor

2    "a pass" because he "didn't have anything to do with it."  Price doubted the story, however,

3    and he pressed Taylor with questions.  Taylor, in Price's words, "got disgruntled" and just

4    said: "It was either him or me."[70]

5        A fired .25 caliber bullet was recovered from a portion of the ceiling of the bedroom at

6    Darris Taylor's grandmother's house.[71]

7        The three .25 caliber bullets recovered during the autopsy all were fired from the same

8    weapon.  The three .25 caliber shell casings found in Rayford's motel room also all were

9    expended from a common weapon.  It could not be determined conclusively – through

10    forensic examination – that the three shell casings were expended from the same weapon

11    from which the three bullets were fired.  It further could not be determined from forensic

12    examination whether or not the .25 caliber bullet recovered at Taylor's grandmother's house

13    was fired from the same weapon as the weapon that killed Rayford.  Nor could it be

14    determined by forensic examination when the .25 caliber bullet recovered at Taylor's

15    grandmother's house was fired into the ceiling or by whom.  The .25 caliber round of course

16    is a very common round of ammunition.[72]

17        16.  When a homicide detective questioned Akilah City on March 8, 1996, about the

18    Rayford case, she gave substantially the same account that she did at Taylor's trial, *i.e.*, that

19    Taylor called her on March 1, 1996, and asked her to help rob and kill an individual.[73]  She

20    made these statements to the police over four years before the Rayford trial and nearly two

21    years prior to the Silver letter.

22        / / / /

23

24       [70]#43, Ex. 25, at 70-80 (Bates 001141-43).

25       [71]#43, Ex. 23, at 179-80 (detective); *id.*, Ex. 25, at 14-21 (Bates 001127-28)(crime scene analyst); *id.*,

26    at 33 (firearms and tool marks examiner).

27       [72]#43, Ex. 25, at 33-44 (Bates 001131-34)(firearms and tool marks examiner).

28       [73]#43, Ex. 23, at 68-74 (detective).

1        17.  Akilah City told the police what she told them in March 1996 about Taylor's request

2    to her on March 1, 1996, without the police or the district attorney offering to provide, agreeing

3    to provide, or providing any *quid pro quo*, benefit, or promise of a benefit.  The homicide

4    detective clearly and emphatically testified that he neither offered nor gave City any benefit

5    in exchange for her statement and that he told her that he would provide no benefit.[74]

6    Petitioner, who has the burden of proof in seeking federal habeas relief, has not presented

7    any evidence that City made the statements to the police in March 1996 regarding the

8    Rayford case in exchange for a *quid pro quo*.

9        18.  During her testimony in the Rayford trial, Akilah City testified that neither the

10   police, the  prosecutor in that case, nor any other prosecutor had ever promised to help her

11   with anything in exchange for her testimony in the Rayford trial.[75]

12       19.  At the Rayford trial, defense counsel Dayvid Figler sought to impeach Akilah City's

13   testimony in this regard in the following fashion, which the Court quotes in full context:

14       Q:    Now, the prosecutor asked you if she specifically had
             promised you anything, correct?
15
16       A:    Yes.

17       Q:    Now you know she works for the District Attorney's Office,
             right?
18       A:    Yes.

19       Q:    You know there is [sic] other district attorneys as well,
             correct?
20
         A:    Yes.
21
22       Q:    Okay.

23   ───────────────

         [74]#43, Ex. 23, at 69-70, 89-91, 127-29 & 139.

24
         [75]*Id.*, at 12-14, 34-35 & 42-43.  Petitioner has focused in federal filings on the fact that the prosecutor
25   in the Rayford trial asked on direct whether "*I* promised you anything."  On cross-examination, however,
     defense counsel – when setting City up to impeach her with the Silver letter, as discussed further, *infra* –
26   elicited testimony from City that neither the prosecutor in that case *nor any other prosecutor* ever had
     promised her anything.  The prosecutor on redirect similarly elicited testimony from City ruling out any
27   promises by the police, the district attorney's office, or herself.  The nuance focused upon by petitioner herein
     thus never has been a material matter.  City clearly testified at trial that no prosecutor offered her anything for
28   her testimony in the Rayford trial.

                                                    -22-

1       Now has any district attorney ever promised you help with
        anything?

2

3  A:   No.

4  Q:   Has any district attorney ever promised to do something
        on your behalf for you?

5  A:   No.

6  Q:   Has any district attorney ever made any kind of offer of
        benefit to you whatsoever?

7

8  A:   No.

9  Q:   None?

10 A:   None.

11 Q:   Now, Ms. City, you are currently incarcerated?

12 A:   Yes.

13 Q:   And you don't like being incarcerated?

14 A:   Of course not.

15 Q:   Of course not.

16      *You go in front of a parole board or pardon board or
        something like that?*

17 A:   Soon, yes.

18 MR. FIGLER:                May I approach, your Honor.

19 THE COURT:                 Yes.

20 MS. DE LA GARZA:           May we approach, Judge?

21 THE COURT:                 Yes.

22              (Off the record discussion not reported.)

23 MR. FIGLER:                *I will have you look at that.*

24 *THE WITNESS*:             *Okay.*

25 MR. FIGLER:                Okay.

26 Q:   (BY MR. FIGLER) *Looking at this,* is it still your testimony,
        yes or no, has any prosecutor ever tried to help you in your
27      situation?

28      Yes or no?

-23-

1    A:    Yes, *with that letter*.

2    Q:    Okay?

3    A:    *That's the first time I've ever seen it.*

4    Q:    Okay

5    #43, Ex. 23, at 34-36 (emphasis added).[76]

6        20.   On state post-conviction review in the Rayford case, Taylor's post-conviction

7    counsel, Christopher Oram, made the following representations to the state district court on

8    the record regarding the Silver letter:

9        Your Honor, before I get started, there's a couple of things
10   I need to add to this brief as an officer of the court.  First, I have
     talked to the prosecutor and to Mr. Figler about the letter in
11   question.    That was the letter that I'm claiming was an
     inducement for Akilah City to testify.   I have argued in this
12   particular case that the defense did not have it because at the
     time in [the] trial transcript Mr. Figler does hand Akilah City a
13   letter, but it is not identified which letter.  Having spoken with the
     attorneys, *it is now quite clear that the letter Mr. Figler had is the
14   letter in question* and the Court should know that.

15   #59, Ex. I, at 2; see also *id.*, at 3 (again acknowledging that "[i]t appears that . . . Mr. Figler

16   did have the letter" and "[i]t appears that he questioned Miss City over the letter").

17       21.   In its oral reasons, the state district court made a factual finding that, *inter alia*,

18   it appeared that Dayvid Figler had approached the witness and showed her the Silver letter

19   and that the witness had acknowledged the letter.[77]

20       22.   In its written findings, the state district court made a factual finding that state post-

21   conviction counsel had conceded both that trial counsel had a copy of the Silver letter and

22   that he used the letter when cross-examining City. #45, Ex. 48, at 2.

23

24   ───────────────

25   [76]The Court notes the shift between the questions asked and the alleged impeachment offered.
     Defense counsel asked City – consistently – whether a prosecutor had "offered" or "promised" her any
26   benefit.  He then showed her a letter and asked her whether "any prosecutor ever tried to help you," which is
     not the same thing as offering or promising a benefit to her.  Establishing only that, unbeknownst to City, a
27   prosecutor had tried to help her did not contradict her testimony that no prosecutor had promised or offered to
     help her.

28   [77]#59, Ex. I, at 7.

-24-

1       23.   On the state post-conviction appeal, in addressing the question of whether

2   petitioner had demonstrated cause for the failure the raise the related substantive claims on

3   direct appeal, the Supreme Court of Nevada found, *inter alia*:

4         . . . . Taylor does not claim that his appellate counsel in
    the Rayford case [which was Mr. Figler] was unaware of the letter,

5         and counsel should have been aware of it because trial counsel
    showed it to City during cross-examination and questioned her

6         about it.

7   #45, Ex. 52, at 3; see also *id.*, at 7 (In discussing a different issue, the state high court found:

8   "Trial counsel showed the letter to City and cross-examined her about it, eliciting from her that

9   the State had tried to help her by writing the letter.").

10       24.   Taylor's trial counsel in the Rayford case, Dayvid Figler, was aware of the Silver

11   letter; he had the Silver letter in his possession; and he used the Silver letter to cross-examine

12   Akilah City at the Rayford trial.   Accordingly, petitioner was not prevented by alleged State

13   nondisclosure of the letter from raising the substantive claims in federal Ground 1 on the state

14   direct appeal.   Trial and appellate counsel, Mr. Figler, had the letter in his possession when

15   he briefed the appeal, as he had cross-examined City about the letter.

16       Petitioner has not presented credible, much less clear and convincing, evidence to the

17   contrary.

18       In this regard, the involved assistant district attorney, Melisa De La Garza, testified

19   credibly that it was the Silver letter that Figler presented at the bench conference and then

20   handed to City before cross-examining her on it.   De La Garza further testified credibly that

21   she was not aware of and had not seen the Silver letter prior to that time.[78]

22       / / / /

23

24

25   [78]Transcript, at 84-88, 90-91 & 95-96.  A decade after the fact, De La Garza could not be sure
whether Exhibit No. 13 in this case was the same exact letter.  However, the letter that she saw at trial was a

26   typewritten letter from Silver to the parole board regarding Akilah City.  Petitioner has presented no evidence
that there was any other such letter other than the letter in Exhibit No. 13.  Petitioner, again, has the burden

27   of proof on federal habeas review, and, in this instance, he further must overcome the state court findings of
fact in this regard by clear and convincing evidence.  The evidence presented at the federal evidentiary

28   hearing preponderates in support of the conclusion that the letter that Figler showed to the court, opposing
counsel, and the witness at the Rayford trial was the Silver letter.

1      Defense trial and appellate counsel, Dayvid Figler, did not give credible testimony to

2 the contrary.  Figler never unequivocally testified that he did not have the Silver letter at trial

3 and did not cross-examine Akilah City as to the Silver letter.  Figler suggested initially in his

4 testimony only that he had "no recollection" that he had the letter.  He further suggested

5 initially in his testimony that the letter at trial "very well could have been a blank piece of

6 paper," "could have been a letter that was written by Darris [Taylor] to Akilah [City]," could

7 have been a document that he held up only as a bluff, or "could have been a lot of things."

8 Later in his testimony, however, he said that he would not have shown the witness a blank

9 piece of paper.  When confronted with the trial transcript, he at first sought to maintain that

10 he showed the letter referred to at trial to De La Garza and not to the witness.[79]

11      Figler's testimony in this regard flies in the face of the most probable permissible

12 reading of the transcript of the trial proceedings quoted in Finding No. 19 above.  After

13 referring to parole proceedings, Figler quite clearly requests *the witness* to look at something

14 and she responds: "Okay."  Figler then asks the witness whether, after "*[l]ooking at this*," it

15 was still her testimony that no prosecutor ever had tried to help her.  The witness responds:

16 "Yes, *with that letter*."  The testimony clearly is not referring to a letter that the witness has not

17 been shown, clearly is not referring to a document that merely has been held up by counsel

18 as a "bluff," and clearly is not referring to a letter from Taylor to City.  The testimony instead

19 quite clearly is referring to a letter by a prosecutor that was shown to the witness by Figler at

20 the Rayford trial and that allegedly sought to help her, apparently in connection with parole.

21 Petitioner – who again has the burden of proof on federal habeas review – has not presented

22 this Court with any other letter by a prosecutor allegedly seeking to help Akilah City with

23 regard to parole or any other matter.  The only such letter presented on state and federal

24 post-conviction review has been the Silver letter.  The evidence preponderates that Figler

25 showed City the Silver letter during cross-examination, and nothing in Figler's federal

26 evidentiary hearing testimony credibly establishes the contrary to be more likely than not.

27

28      [79]Transcript, at 102-06 & 109-14.

1    Indeed, by the end of Figler's testimony, he asserted only that "I have no recollection

2 whether I had this document or not when I was preparing my appellate briefs" and "I don't

3 recall if I did or didn't."  When asked directly whether he did not introduce the Silver letter into

4 evidence at trial because he did not have the Silver letter, he responded: "I don't know."

5 Figler further acknowledged, with regard to De La Garza's testimony on this point, that "if she

6 testified with personal knowledge under oath, I would, knowing Melisa De La Garza, believe

7 her to be a truthful person."[80]

8    Figler's nuanced, equivocal, and *post hoc* rationalized testimony does not credibly

9 establish, contrary to the most plausible reading of the trial transcript, that Figler did not have

10 and use the Silver letter when he cross-examined Akilah City and thus later in preparing the

11 appellate briefing.  Nor does his testimony clearly and convincingly overcome the express

12 concession made in the state proceedings and the findings made by the state courts.

13    In this same vein, the Court does not find Christopher Oram's effort at the federal

14 evidentiary hearing to reconstruct what happened in the state post-conviction proceedings to

15 be credible.  Oram testified that he had no independent recollection of speaking to Figler prior

16 to making the concession to the state district court quoted in Finding No. 20, although he

17 "may well have."  Oram then sought to suggest that he may have made the concession based

18 not on something that Figler said but instead on the fact that the Rayford trial transcript refers

19 to the cross-examination of City with an unidentified letter.  Oram expressed the concern that

20 he may have had a conversation with Figler but "that maybe I did not relay it accurately."[81]

21    This reconstruction effort is belied by the contemporaneous state court record.  On

22 state post-conviction review in the Rayford case, Oram relied upon the fact that the trial

23 transcript of City's cross-examination did not identify the letter to initially argue that the letter

24 was *not* the Silver letter.  *E.g.,* #59, Ex. I, at 2, lines 13-15.  The trial transcript therefore could

25 not have been a new piece of information that caused Oram to change his position and

26

27    [80]Transcript, at 110, 117, 118 & 120.

28    [81]*Id.,* at 123, 125 & 127-29.

1  instead concede that the letter *was* the Silver letter.  Rather, as he stated to the state district

2  court, "[h]aving spoken with the attorneys, it is *now* quite clear that the letter Mr. Figler had

3  is the letter in question."  *Id.*, at 2, lines 16-17 (emphasis added); see also *id.*, at 6, lines 15-

4  17.  Oram's federal evidentiary hearing testimony seeking to suggest to the contrary on this

5  point was, at the very best, not credible.

6          The inartful attempted *post hoc* rationalizations of neither lawyer was credible to this

7  Court.  Their equivocal testimony based upon dubious argument rather than independent

8  actual recollection indisputably did not present clear and convincing evidence overcoming the

9  state courts' express factual findings to the contrary.

10         25. Petitioner has not come forward with new reliable evidence that was not presented

11  at the trial that, together with the evidence adduced at trial, demonstrates that it is more likely

12  than not that no reasonable juror would have found him guilty beyond a reasonable doubt in

13  the Franklin case.  Akilah City did not recant – and instead reaffirmed – her trial testimony that

14  Taylor participated in the Franklin robbery.[82]  She sought to maintain at the federal evidentiary

15  hearing that Taylor did not plan the robbery, which conflicts with her sworn trial testimony.

16  But even if the Court were to view this particular facet of her hearing testimony as reliable

17  evidence – which it does not – Taylor still would have had culpability as a principal as an aider

18  and abettor.  He did not have to be the main force behind the planning of the robbery to be

19  guilty of the offenses for which was convicted, including the conspiracy offense.  Nothing in

20  City's federal evidentiary hearing testimony would tend to establish that no reasonable juror

21  would have found him guilty of the offenses beyond a reasonable doubt.

22         26. Petitioner has not come forward with new reliable evidence that was not presented

23  at the trial that, together with the evidence adduced at trial, demonstrates that it is more likely

24  than not that no reasonable juror would have found him guilty beyond a reasonable doubt in

25  the Rayford case.  Petitioner presented no recantation testimony whatsoever as to the

26  Rayford case at the federal evidentiary hearing.

27

28         [82]Transcript, at 60-61 & 71.

-28-

CONCLUSIONS OF LAW

1.  The Court has jurisdiction over the subject matter under 28 U.S.C. § 2254(a).

2.  Ground 1 is procedurally defaulted, as to both the Franklin and Rayford convictions.

Under the procedural default doctrine, federal review of a habeas claim may be barred if the state courts rejected the claim on an independent and adequate state law ground due to a procedural default by the petitioner.  Review of a defaulted claim will be barred even if the state court also rejected the claim on the merits in the same decision.  Federal habeas review will be barred on claims rejected on an independent and adequate state law ground unless the petitioner can demonstrate either: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review.  *See,e.g., Coleman v. Thompson*, 501 U.S. 722, 731-732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

In the present case, the Supreme Court of Nevada rejected the claims in Ground 1 when they were presented on state post-conviction review because the claims could have been raised on direct appeal in each case but were not.[83]  Petitioner contends, first, that he can establish both cause and prejudice to overcome the procedural default as to each conviction, based upon alleged non-disclosure by the State of the Silver letter.  He contends, second, that a fundamental miscarriage will result in the absence of review.  For the reasons assigned in Conclusions Nos. 3 through 9 below, the Court is not persuaded.

3.  As to the Franklin conviction, petitioner has demonstrated cause for the failure to raise the claims in Ground 1 on direct appeal, but he has not demonstrated the prejudice necessary to overcome the procedural default.

To demonstrate cause, the petitioner must establish that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  *E.g., Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986); *Hivala v. Wood*,

---

[83]#45, Ex. 52, at 2-3.

-29-

1    195 F.3d 1098, 1105 (9ᵗʰ Cir. 1999).  To demonstrate prejudice, he must show that the

2    alleged error resulted in actual harm.  *E.g., Vickers v. Stewart*, 144 F.3d 613, 617 (9ᵗʰ Cir.

3    1998).   Both cause and prejudice must be established.  *Murray*, 477 U.S. at 494, 106 S.Ct.

4    at 2649.

5        4. Petitioner has demonstrated cause for the failure to raise Ground 1 on direct appeal

6    in the Franklin case.

7        As the Court has found in Findings Nos. 13 and 14, the Silver letter was not copied to

8    defense counsel, was not provided to either trial or appellate counsel in the Franklin case

9    before the completion of appellate briefing in that case, and thus was not present in the

10   Franklin defense file reviewed by appellate counsel.  The Court is confident that, had the

11   Silver letter been in the Franklin defense file, appellate counsel Lori Teicher would have

12   sought to raise an issue in this regard on direct appeal.

13       5. Petitioner has not demonstrated prejudice as to the Franklin conviction, however.

14       Akilah City did not testify falsely that there was no deal or benefit to her from testifying.

15   The Silver letter neither was in existence at the time of her testimony nor had it even been

16   contemplated at that time, much less promised to City.  As the Court has found in Findings

17   Nos. 5 through 12, petitioner has failed to establish that there was a prior *quid pro quo*

18   pursuant to which Silver would help City with regard to her parole or otherwise in exchange

19   for her testimony.  City instead testified at the Franklin trial to the same effect as her prior

20   statements to the police -- also made without a *quid pro quo* deal -- without any benefit having

21   been supplied or promised by Silver or the State.  Petitioner therefore would not have been

22   able to present a claim on direct appeal based on the Silver letter that would have led to a

23   different outcome, whether under *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d

24   1217 (1959), *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),

25   and/or *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  Petitioner thus

26   cannot demonstrate prejudice with regard to Ground 1 as to the Franklin conviction.  A

27   showing of both cause and prejudice is required to overcome the procedural default of the

28   claim.  *E.g., Murray, supra.*

1    6.  As to the Rayford conviction, petitioner has not demonstrated cause for the failure
2    to raise the claims in Ground 1 on direct appeal.

3    As the Court has found in Findings Nos. 19 through 24, defense counsel in the Rayford
4    case, who was both trial and appellate counsel, had the Silver letter and cross-examined
5    Akilah City about the letter.  The testimony presented at the federal evidentiary hearing
6    seeking to establish to the contrary was not credible to this Court.  Over and above this
7    Court's own independent *de novo* factual findings after hearing the evidence, petitioner has
8    failed to rebut by clear and convincing evidence the presumption of correctness accorded by
9    28 U.S.C. § 2254(e)(1) to the state court factual findings that defense counsel in the Rayford
10   case cross-examined Akilah City with the Silver letter.  *See,e.g., Stevenson v. Lewis*, 384
11   F.3d 1069, 1072 (9th Cir. 2004)(presumption of correctness attaches to factual findings made
12   by state trial level courts and appellate courts alike).  Petitioner thus has failed to demonstrate
13   that alleged non-disclosure of the letter prevented defense counsel from raising the claims
14   in Ground 1 on direct appeal in the Rayford case.  He thus has failed to demonstrate cause.

15   7.  Petitioner accordingly further has failed to demonstrate prejudice as to Ground 1
16   with regard to the Rayford conviction.  Because defense counsel both had and used the Silver
17   letter to cross-examine City, he could not have presented a viable claim under *Napue, Giglio*
18   and/or *Brady* on direct appeal in the Rayford case.

19   8.  Petitioner further has failed to demonstrate – as to either the Franklin conviction or
20   the Rayford conviction – that a fundamental miscarriage of justice will result in the absence
21   of review of Ground 1.

22   A petitioner who cannot show cause and prejudice still may obtain review of his
23   defaulted claims if he can demonstrate that the failure to consider the claims would result in
24   a fundamental miscarriage of justice.  In noncapital cases, however, this exception has been
25   recognized only for petitioners who can demonstrate actual innocence.  *E.g., Poland v.*
26   *Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997).  In order to satisfy this actual innocence
27   gateway, a petitioner must come forward with new reliable evidence that was not presented
28   at the trial that, together with the evidence adduced at trial, demonstrates that it is more likely

-31-

than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *See,e.g., Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003), *cert. denied*, 124 S.Ct. 2039 (2004). In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency. *See,e.g., Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 2518-19, 120 L.Ed.2d 269 (1992). The court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332, 115 S.Ct. at 869.

In the present case, petitioner maintained in his federal papers that Akilah City had recanted her trial testimony and would testify if called that her testimony at each trial was false. When called under oath at the evidentiary hearing, however, City stood by and corroborated rather than recanted the substance of her trial testimony as to petitioner's involvement in the Franklin offenses. She further did not recant her trial testimony in the Rayford case. See Findings Nos. 25 & 26. Petitioner accordingly failed to even begin to present new reliable evidence that would render it more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in each case.[84]

Petitioner thus has not established that a failure to consider the claims in Ground 1 will result in a fundamental miscarriage of justice. In the absence of a showing of actual innocence, there otherwise is not a separate exception for a "miscarriage of justice" based

---

[84]City's purported unsworn recantations to investigators clearly would not constitute reliable evidence that would make it more likely than not that no reasonable juror would have found Taylor guilty – particularly as she did not follow through with any such alleged recantation when called under oath and subject to cross-examination. Indeed, City acknowledged during the Rayford trial that she had made exculpatory and/or impeaching statements to defense investigators prior to the trial. She testified then that she made those statements because the investigators were bothering her and she did not want to see them. #43, Ex. 23, at 36-38. Just as jurors in the Rayford case rendered a verdict consistent with City's sworn testimony rather than her unsworn statements to defense investigators, petitioner cannot establish that City's unsworn recantations – to investigators for a man for whom she apparently still feels affection and with whom she shares a son – would make it more probable than not that no reasonable juror would find him guilty beyond a reasonable doubt. Moreover, particularly in the Franklin case, there was ample evidence upon which to base a conviction in each case without City's testimony. See Finding Nos. 4 & 15.

1   upon the premise that the underlying alleged constitutional violations in a noncapital state

2   criminal trial gave rise to "a fundamental miscarriage of justice."   *See,e.g., Johnson v.*

3   *Knowles*, 541 F.3d 933 (9th Cir. 2008).  A showing of actual innocence is the sole – and

4   essential – requirement to establish a fundamental miscarriage of justice in order to avoid a

5   procedural default.  *Id.*  Petitioner has failed to satisfy this requirement in the present case.

6        9.  Ground 1 accordingly is procedurally defaulted as to the both convictions.  Petitioner

7   has failed to demonstrate both cause and prejudice as to each conviction with regard to

8   Ground 1.  He further has not demonstrated that a failure to review Ground 1 will result in a

9   fundamental miscarriage of justice.

10        10.  The Court holds, in the alternative, on *de novo* review as to the law, that Ground

11   1 is without merit.  As discussed in Conclusions Nos. 5 and 7, petitioner cannot establish a

12   viable claim under *Napue*, *Giglio*, and *Brady* concerning the Silver letter with regard to either

13   trial.  In the Franklin case, City's testimony was not false because the Silver letter did not exist

14   and had not been contemplated or promised when City testified in that case.  In the Rayford

15   case, defense counsel possessed the Silver letter and cross-examined City about the letter.

16        11.  On Ground 2, the state supreme court's rejection of petitioner's challenge to the

17   sufficiency of the evidence presented at the Franklin trial was neither contrary to nor an

18   unreasonable application of clearly established federal law.

19        The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

20   deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 117 S.Ct. 2059,

21   2066 n.7(1997).  Under this deferential standard of review, a federal court may not grant

22   habeas relief merely on the basis that a state court decision was incorrect or erroneous.  *E.g.,*

23   *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Instead, under 28 U.S.C. § 2254(d),

24   the federal court may grant habeas relief only if the decision: (1) was either contrary to or

25   involved an unreasonable application of clearly established law as determined by the United

26   States Supreme Court; or (2) was based on an unreasonable determination of the facts in

27   light of the evidence presented at the state court proceeding.  *E.g.*, *Mitchell v. Esparza*, 540

28   U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g., Mitchell,* 540 U.S. at 15-16, 124 S.Ct. at 10. A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell*, 540 U.S. at 16, 124 S.Ct. at 11. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003). Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333

1   F.3d at 992.  When the review deferential standards of the AEDPA and *Jackson* are applied

2   together, the controlling question for decision on federal habeas review thus becomes one

3   of whether the Nevada Supreme Court's decision reflected an unreasonable application of

4   the *Jackson* standard to the evidence presented at trial.  *See,e.g., Juan H. v. Allen*, 408 F.3d

5   1262, 1274-75 (9th Cir. 2005), *cert. denied*, 546 U.S. 1137, 126 S.Ct. 1142, 1145, 163 L.Ed.2d

6   1000 (2006).

7        In rejecting petitioner's challenge to the sufficiency of the evidence in the Franklin case,

8   the Supreme Court of Nevada concluded that "sufficient evidence was  adduced from which

9   the jury, acting reasonably and rationally, could have found the elements of conspiracy to

10  commit robbery, burglary while in possession of a firearm, and robbery with the use of a

11  deadly weapon beyond a reasonable doubt."[85]

12       In the exhausted claim remaining before this Court, petitioner urges that the evidence

13  at the Franklin trial was insufficient because Akilah City had a strong motive to lie.  Petitioner

14  contended on the state direct appeal that City's testimony was unreliable because she was

15  "a scorned girlfriend."[86]  The state supreme court's rejection of this claim clearly was neither

16  contrary to nor an unreasonable application of the *Jackson* standard.

17       First, the credibility and reliability of Akilah City's testimony was for the jury to weigh.

18  City's alleged motives for testifying were fodder for closing argument, not for a viable

19  constitutional challenge to the sufficiency of the evidence.

20       Second, there was not merely sufficient but instead ample evidence of Taylor's guilt

21  even without Akilah City's testimony.  Taylor admitted to the police that he was in Franklin's

22  apartment at the time of the robbery, and the defense conceded at trial that he was there at

23  that time.  Taylor maintained that he thought he was there only to help City move something

24  and that he did not realize until later that he was in the midst of a robbery.  While Taylor's

25  strained story hardly stood under its own weight, his story as to what transpired while he was

26  _____

27  [85]#44, Ex. 39, at 9.

28  [86]See # 55, at 12-14; #44, Ex. 32, at 15-16.

-35-

1   in Franklin's apartment with Price and City is directly contradicted by Franklin's testimony as

2   to what she heard while pretending to be unconscious.  Given Taylor's concession that he

3   was there with Price and City at the relevant time, the jury only had to believe Franklin to

4   convict on all counts, without ever considering City's testimony.  See Finding No. 4.

5       The state supreme court's rejection of this claim accordingly was neither contrary to

6   nor an unreasonable application of clearly established federal law.

7       12.  The state supreme court's rejection of petitioner's challenge to the sufficiency of

8   the evidence presented at the Rayford trial was neither contrary to nor an unreasonable

9   application of clearly established federal law.

10      In the exhausted claim remaining before the Court, petitioner contends that the State's

11  evidence, on its face, was insufficient to prove the requisite elements of the offenses in

12  question.[87]  The Supreme Court of Nevada concluded that there was sufficient circumstantial

13  evidence for a rational trier of fact to find the essential elements of first-degree murder and

14  robbery.[88]  The state high court's rejection of this claim was neither contrary to nor an

15  unreasonable application of the *Jackson* standard.  The State presented evidence, *inter alia*,

16  that Taylor solicited City to help him shoot and kill an individual from California on the

17  afternoon immediately prior to Rayford being shot to death; that the last telephone call placed

18  by Rayford on the morning that he was murdered went to Taylor and concluded only a short

19  time before Rayford's likely time of death; that Taylor placed a call to Rayford's girlfriend in

20  California only a short time after the likely time of death in an amateurish effort to cover his

21  tracks, calling on the same cell phone that Rayford had brought with him from California; that

22  Taylor had Rayford's possessions, including the cell phone and unique items of clothing and

23  jewelry, after the murder; and that Rayford's body was found in a motel room with no clothes

24  in the room suitable for going outside the room and with the inner lock that can be engaged

25  only from the inside not being engaged.  A rational trier of fact could have found beyond a

26

27      [87]See #55, at 12-13.

28      [88]See #44, Ex. 33, at 1-2.

-36-

1  reasonable doubt based on the circumstantial evidence presented that the last person to
2  close the door prior to the mid-morning housekeeping check was the murderer leaving with
3  Rayford's clothes and that the murderer was Taylor, consistent with his previously stated plan
4  to kill and rob Rayford.  See Finding No. 15.

5  The state supreme court's rejection of this claim accordingly was neither contrary to
6  nor an unreasonable application of clearly established federal law.

7  14.  Petitioner is not entitled to a certificate of appealability as to the dismissal of
8  Ground 1 with prejudice as procedurally defaulted.

9  Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must
10  issue or deny a certificate of appealability when it enters a final order adverse to the
11  petitioner.  A district court order granting or denying a certificate of appealability does not
12  eliminate the requirement of filing a timely notice of appeal.  A motion to reconsider the order
13  regarding a certificate of appealability does not extend the time to appeal.

14  As to claims rejected on procedural grounds, the petitioner must show: (1) that jurists
15  of reason would find it debatable whether the petition stated a valid claim of a denial of a
16  constitutional right; and (2) that jurists of reason would find it debatable whether the district
17  court was correct in its procedural ruling.  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct.
18  1595, 1604, 146 L.Ed.2d 542 (2000).  While both showings must be made to obtain a
19  certificate of appealability, "a court may find that it can dispose of the application in a fair and
20  prompt manner if it proceeds first to resolve the issue whose answer is more apparent from
21  the record and arguments."  529 U.S. at 485, 120 S.Ct. at 1604.  Where a plain procedural
22  bar is properly invoked, an appeal is not warranted.  529 U.S. at 484, 120 S.Ct. at 1604.

23  Given the evidence presented and factual the findings made herein, jurists of reason
24  would not find the district court's holding that Ground 1 is barred by procedural default to be
25  debatable or wrong.  With regard to the Franklin trial, petitioner failed to demonstrate
26  prejudice as to Ground 1 because the witness did not testify falsely with regard to a letter that
27  did not exist and that was not contemplated or promised when she testified.  Petitioner did not
28  establish by a preponderance of the evidence the existence of a prior *quid pro quo* agreement

1    or understanding, and the Silver letter instead constituted a spontaneous, gratuitous act after
2    the fact.   See Conclusion No. 5.   With regard to the Rayford trial, petitioner failed to
3    demonstrate either cause or prejudice as to Ground 1 because defense counsel not only had
4    the Silver letter but cross-examined the witness with regard to the letter.   See Conclusions
5    Nos. 6 & 7.  Petitioner further did not present any sworn recantation testimony, and he failed
6    to demonstrate that a fundamental miscarriage of justice would result from a failure to review
7    Ground 1 on the merits.  See Conclusion No. 8.[89]

8        15.  Petitioner is not entitled to a certificate of appealability as to the dismissal of
9    Ground 2 on the merits.

10        As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c),
11   a petitioner must make a "substantial showing of the denial of a constitutional right" in order
12   to obtain a certificate of appealability.   *Slack*, 529 U.S. at 483-84, 120 S.Ct. at 1603-04;
13   *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999).  To satisfy this standard, the petitioner
14   "must demonstrate that reasonable jurists would find the district court's assessment of the
15   constitutional claim debatable or wrong."  *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

16        Jurists of reason would not find the district court's rejection of the Ground 2 on the
17   merits to be debatable or wrong.  Petitioner's challenges in Ground 2 to the sufficiency of the
18   evidence at both trials at bottom concern matters going to the weight to be given to evidence
19   that properly were committed to the jury's determination in each case.  See Conclusions Nos.
20   11 & 12.

21        If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of
22   Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

23                                          ORDER

24        IT THEREFORE IS ORDERED that Ground 1 is DISMISSED with prejudice on the
25   basis of procedural default and that Ground 2 is DISMISSED with prejudice on the merits.

26

27   _____

28   [89]Petitioner further is not entitled to a certificate of appealability as to the Court's alternative holding
     that Ground 1 is without merit, for substantially the reasons discussed in the text.  See Conclusion No. 10.

-38-

1    IT FURTHER IS ORDERED that a certificate of appealability is DENIED.

2    The Clerk of Court shall enter final judgment accordingly, dismissing this action with

3    prejudice.

4    DATED: July 27, 2010.

5

6

7    _____

8    KENT J. DAWSON
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28